Thank you, Chief Judge Pryor. May it please the Court. My name is John Parker Sweeney and I represent the Appellants, National Rifle Association of America, and Brooke Stefano. We are challenging Florida's ban on adults aged 18 to 20. When does Brooke Stefano turn 21? She turns 21 on May of 2025, Your Honor. Okay. And we have already identified another member of the NRA who is younger, at this point 19, who is prepared to step into the lawsuit and we will promptly move to add that plaintiff as we have previously. Okay, thank you. I'd like to address the questions about facial challenge that the Court put in the letter to counsel because we have not briefed those. So if I may start there on the appropriate standard for deciding Second Amendment facial challenges and the significance of any overlap with other restrictions. Let me take a shot at reconciling Solero and Patel and Bruin, Heller, and Rahimi, as well as this Court's decisions in Club Madonna, the Sister Song case, and Pew. So I believe that where the constitutional test is generally satisfied, the statute is upheld against a facial challenge, perhaps leaving room for as-applied challenges for specific constitutionally protected conduct. And I believe that's what occurred in the Sister Song case. When, however, the constitutional test is not generally satisfied, the statute is struck. And that's what occurred in Heller and Bruin. While it is often said that in a facial challenge, the plaintiff's specific facts are relevant only to standing, courts often look to the plaintiff's individual situations in facial challenges. Where the statute is constitutionally applicable to the plaintiff, as in the Solero case and the Rahimi case, a facial challenge that might be unconstitutional as to others will fail. Similarly, where a statute is unconstitutional as to the plaintiff, as in Patel, Heller, Bruin, and they are generally representative of the population that's targeted by the restriction. Well, Solerno sets forth a no set of circumstances test. So the question is, if a 20-year-old can possess a firearm by means other than purchase from a parent, from a friend, from a relative, go to Georgia, go to Alabama, this is a facial challenge. How do you satisfy Solerno's no set of circumstances test? Well, the Solerno no set of circumstances test was significantly interpreted in the Patel case. And that was explicated recently in the Pugh decision of this court. But without mentioning Patel, the earlier Club Madonna decision had said, the question that Solerno requires us to answer is whether the statute fails the relevant constitutional test. And that's exactly what the court addressed in the Rahimi case. The court made clear in Club Madonna that the government's proposed application of Solerno, which is the test that you just described, Your Honor, states could consistently sidestep facial challenges and the unambiguous command of federal law so long as they crafted some instance when the law at issue aligned with federal objectives. Similarly, this court in Pugh said that holding the application of the statute to appellant's constitutional conduct was constitutionally valid and rejected a facial challenge. But it said there, as Patel had said, in determining whether a statute meets this standard, we consider only applications in which it actually authorizes or prohibits conduct. And that brings me to the question of overlap. So if there is overlap, for instance, with the felon in possession law, that some 18 to 20 year old Florida young adults may be convicted felons and they are prohibited from possession, let alone acquisition of a firearm by 922G of the federal law. But the statute doesn't apply to prohibit them in those circumstances. The overlap is irrelevant to the restriction that the statute we're looking at provides. So again, there's a gift or loan issue that the state has raised that suggests that the statute's valid in the face of a facial challenge because young adults can obtain firearms from their parents by gift or loan. Of course, that doesn't apply to all young adults. But that's really not a facial challenge, all circumstances issue, because the statute neither prohibits nor authorizes gifts or loans. Well, it just doesn't apply. You would agree that if the statute is constitutional, generally, we don't have to worry too much about this issue, right? Absolutely. And I'd love to get to that argument. Yeah. Why don't we get to that argument? So you do not contest, do you, that Florida could prohibit the commercial sale of firearms to minors under the age of 18? Do you? I do not. So what I'm wondering is, if soon after, say, a year after the adoption of the 14th Amendment, Florida had adopted this law, when universally anyone under the age of 21 would have been considered a minor, would it have been constitutional then? And if not, why not? No, it would not, Your Honor. Why? Because it was not a tradition known to our founders at the time the Second Amendment was first adopted. Because of the restriction or because of the age? Well, the restriction on the age group, yes. But if there were only a handful of laws addressing the restriction, age-wise, at the time of the founding or at the time of the ratification of the 14th Amendment, why do you set 18 as the bar? Why does your argument stop at 18? Why can't the argument be 15, 16? After all, this country was a very different place back in the late 1700s, very less densely populated. A lot of people living on farms, on outposts, as a country was moving toward the West. And young people, heaven knows how young, had to be able to use and wield firearms to protect themselves, their family, their homes, their livestock, et cetera. So how is it that 18 becomes the magic number for you? I don't know how you can hold that line. Well, the line is based on the relatively universal use of the age 18 for malicious service at the time of the founding. But here's the problem with that, right? I mean, the problem is that the common law at that time gave no rights to anyone under 21, including the ability, the practical ability, to purchase a firearm. And so, because people under 21 worked for their parents on their farms, they did not have their own sources of cash. And because they could not contract, they could not buy firearms on credit. And they had no other rights at all either. They couldn't sue. They couldn't do a lot of things. And so, effectively, and as a practical matter, people under 21 could not purchase firearms. In fact, there were a number of states that had laws that said that the parents were responsible for purchasing firearms for their children who were serving in the militia and the military. And in fact, the history shows that the law allowed parents to pay to exempt their children from military service altogether. So, how does that establish 18 as the number? First of all, the state's speculation that most of the population was agrarian at the time is not supported by any facts in the record. What the record does show is that there were many highly dense urban population centers in which much of the population was centered in at that time. We're not really limited to what is in the record as far as the history goes. And so, if you look at historical sources, they will show that 95% of the country was living in non-urban agrarian settings. And with respect to the urban population, New York City, for example, was the biggest city and it had a population of 33,000. So I'm not sure that gets you where you need to be. I think it does, Your Honor, because the cash versus credit issue that the state speculates about is not a restriction on firearms. When you say the state speculates, do you dispute Judge Rosenbaum's characterization of the common law that effectively disabled children, minors, to purchase on credit? Well, I disagree with disabled. It's an inaccurate characterization of the law. So, at the time of the founding, contracts entered into by minors were voidable. They weren't prohibited from entering into a contract. They weren't void out of initiative. But in fairness, Judge Rosenbaum said, practically, effectively. So do you dispute that? I dispute that. Any anyone with cash could go in and purchase. And frankly... No, but it was a limitation, right? That would explain why some of the militia laws specifically required parents to provide the firearms for the minors who were members of the militia, right? That actually supports our case. In other words, that shows... But it shows that it's a limitation, right? Right. It was a limitation on their ability to purchase, right? No, no. Because if parents were required to provide the firearms, they still were able to bring the firearms, even if for whatever reason... But it suggests that the minors... It lends support to the idea that the minors did not have the same ability to purchase firearms that adults did, right? Suggesting is not the same as prohibiting. There is no restriction on the right of a person... My question was a simple one, okay? It shows that it was a limitation. There was a difference between minors and adults when it came to the purchase of firearms, right? It could be a limitation. But again, if you posit the scenario in which we're living in an agrarian society with small communities, everybody knows each other, and 18-year-old Johnny, on his way to militia, goes into the local gunsmith and wants to purchase a firearm, is that gunsmith going to say, come back with your parents? Do we have any evidence of that? It seems to me that that's much more speculation than anything that anyone has asked you about, right? Imagining what a local gunsmith has done, I don't think is consistent with what the Supreme Court has said we're supposed to look at. I think we're already speculating beyond the record, and we base this on... I just have to say, I don't think I understand that. I mean, isn't it a matter of public record that the common law was, as Judge Rosenbaum has described it to you, and as the Chief Judge has said, that imposes, as a matter of law, a de jure limitation on the ability of minors to purchase firearms. It seems to me, I don't think that you want to die on the hill of denying that the common law imposed limitations. I'm not denying that the common law imposed limitations that could impact the ability to purchase, but it's not a prohibition on the purchase of firearms. But do we need that kind of legal positivist analogy for every aspect of the common law? I don't think that that is what would be supported, certainly by the time of Rahimi. Well, let me pivot quickly to Brown, where the First Amendment... Could you answer my question first? I'm sorry? Are you saying that for any gun restriction, you need a legal positivist prohibition in order to match up, even after Rahimi? A distinctly similar restriction. Yes, Your Honor, you do. So where the interest involved and the concern was present at the time of the founding, you need a distinctly similar restriction that the Supreme Court says, excuse me, the Supreme Court says must have the same burden and the same justification as the modern restriction. I think what my colleagues are suggesting is that the limitations on the purchase of firearms by those under 21 would have meant that there was not a similar concern at the founding. That's what we're trying to explore with you. And what I'm trying to say is the voidability of minor contracts is not distinctly similar to the prohibition against purchase of a protected arm. They're not distinctly similar. There is a different justification. On the one hand, it's the responsibility of minors to be able to stand by their contracts. On the other hand, it's concerned about their use of firearms. If you look at that at the time of the founding, we know that there was no concern about the use of firearms by 18-year-olds. They were required to show up at militia training. If a minor walked into a store or to a gunsmith to purchase a gun and offered to barter for it, were there any restrictions on the minor's right to do so? So there's no credit, there's no cash, but wants to trade. None that I know of and none that's been brought to my attention by the state. Okay, Mr. Sweeney, you've saved five minutes for rebuttal. Let's hear from Mr. Ball. Thank you, Your Honor. Thank you, Your Honor, and may it please the Court. Christopher Baum for the Appellee. Florida's law is consistent with the principles underlying this nation's history of, uh, history and tradition of regulating firearms. That tradition stretches from the founding through reconstruction. Can I, can I ask you a quick question? Do you think that the founding era history alone gets it done? Do we need to consider what I'll call post-ratification, post-'71, post-1791, the evidence, the reconstruction era evidence that you, 19th century evidence that you've put in the record to rule in your favor? I think it does get it done, Your Honor, but I do think that the reconstruction history helps to tell the story a little bit. So at the founding, as Your Honors have already discussed, minors were effectively restricted from purchasing firearms due to the credit-based nature of the economy. You're effective. The word effective is doing a lot of work there because, as far as I can tell, there's no actual restriction on purchase. It's just you're basically saying they couldn't get a loan to do it. Is that what Bruin tells us to look for? I think what Rahimi tells us to look for is whether this, whether Florida's law is of a type that our historical tradition would be understood to permit. So, for example, a positive law at the founding that had said, you know, minors cannot purchase a firearm through credit would have effectively the same effect as the common law restrictions. And because firearms were not necessaries, they were not able to contract for firearms. I guess, so in Bruin, the Supreme Court told us that it needs to match a how and a why, right? The why from the historical tradition needs to be similar to the new thing, and the how needs to be similar. How is the how of Florida's law similar to this lack of, the voidability of a contract with a minor? That's what I'm having trouble with because it seems like there's very, it's very different to say that it's illegal to sell a gun to somebody versus you can sell a gun to them all day long, but it's subject to their decision to void the contract if they happen to get credit for it. The how is similar in that it sets the line at the same age, 21. It's the same restriction, which is on purchase, and it's temporary. It lasts only until they're 21. But 21 now, 18 to 21 now, are legal adults. So one of the issues I have is one of the arguments that you make is that the ban, quote, ensures that parents continue to play a key role in supervising and facilitating 18 to 20-year-olds' access to firearms. The issue is, though, an 18-year-old in the state of Florida or anywhere in any of the 50 states is a legal adult, and parents have no role or responsibility. Sure. So the legislative decision setting regarding the age of majority cannot affect the original understanding of the Second Amendment. No, but it can affect—and here's why I think Judge Lugo's question goes to something, is that it can affect your justification, right? When we're looking at the how and the why, if the justification for treating 18 to 21-year-olds at the time of the founding with voidable contracts and whatnot was that they were children under their parents' care, right? Their parents could take their wages. They couldn't enter into contracts. But on the flip side, the parents also had to, you know, take care of their children. They had an obligation. Florida now has cut 18 to 21-year-olds loose and said, you're on your own. Your parents have no obligation to take care of you. You can enter into contracts. You can have your own apartment. You can do whatever you want to. But then Florida is trying to treat them as children just for the purposes of firearm purchases. And that's where it just seems like there's a mismatch between the how and the why of these older laws and the how and the why of Florida's law. Well, since the founding, the age of majority has varied for different activities. Different activities have always had different ages of majority. How old do you have to be to purchase alcoholic beverages in Florida? 21 and also for tobacco. So the age... None of those are constitutional rights, correct? That's right, Your Honor. But because the age of majority has varied for different activities, a legislative decision in the 70s to say generally for most rights, the age of majority is 18. We're talking about the 1970s, right? That's correct, Your Honor. That does not affect the original understanding. You can conceptualize this as the legislature returning the age of majority for this particular activity back up to 21, which is congruent with the historical... Well, I guess the question my colleagues are asking is, does the Constitution create an evolving standard of adulthood? That's why I wonder whether we even get to step two, right? If we're talking about the how and the why, couldn't you argue that this has evolved at step one because 18 to 20-year-olds were not included in the conception of the right in the first place? No, we have not made that argument, Your Honor. We have not made... I know you haven't, but couldn't you? Why wouldn't you? I don't think so, Your Honor. I don't think that the arguments are as strong for concluding that they are outside the scope of the people, for example, or that purchase is not usually incident to the right to possess. But at step two, when you have a historical tradition of restricting... Right, but that's because minors couldn't say they didn't have the same rights of petition as those over 21. It seems that at the founding, there were a range of constitutional rights that were not enjoyed by minors, even if they are today. That's true, Your Honor. Right, but that's the difference, which is the historical, the difference of status between minors and adults, right? And the issue is that now 18 to 20-year-olds are considered adults. So could Florida have passed a law that said instead of it being a person younger than 21, can it be a person younger than 22 years of age may not purchase a firearm? Would that have been constitutional? As applied to the 22-year-old, I don't think that would be constitutional, Your Honor, because it does not match up with the historical restrictions on those under 21. I think the historical understanding is tied to the age of 21 for the reason that it was both that way at the founding and all the way through Reconstruction. And it's important to... Doesn't the modern characterization, though, matter, which is what I think the Judge Ligo is asking? In other words, let's take it out of the age part. Let's put it in the felon context. So as I understand it, what matters is if we call something a felony now, we compare our modern conception of felony to what felony was back then. So in range and canter, for example, the dissent specifically, that's what mattered, was the modern characterization of what we see it as versus there. Isn't that the same here? Isn't the modern characterization of what we see to be an adult or minor is how we compare it to the founding era, the 1791 era? I don't think it's as clean cut as that, Your Honor, because, again, the definition of a minor varies based on what activity is being permitted. So even at the founding, there were some things that minors were able to do that an adult was able to do. And even now, as Your Honor has pointed out, there are some things that a minor, someone under 21 is not able to do. I know, but we're not looking in the abstract. We're looking at gun possession. So even if we look at whether you are an adult now versus what adults were allowed to do then. In other words, don't we compare likes to the modern conception to what happened now? So the modern conception is you're an adult. Don't we look at what adults were allowed to do or not allowed to do with regard to firearm possession at the time of the founding? No, Your Honor. I think that you look to the age limit and you look to what the restriction was at the founding, what it was through Reconstruction. So when you had these common law restrictions eroding after the War of 1812, after the Industrial Revolution, after the Civil War, you had states stepping in and enacting laws that echoed the founding restriction of 21 because all of a sudden there was a youth firearm crime problem. But the age of majority in those states was still 21 at the time, right? I mean, they were still only regulating the use of firearms by legal minors. That's right, Your Honor. And we think that that echoes the line that was set by the founders at 21. But I mean, if you look at those statutes, they often don't even say 21. They just say minors. Sure. That's the thing, just to follow up on Judge Locke's question. I mean, isn't the line, the historical line between minors and adults and not between 20-year-olds and 22-year-olds? No, Your Honor. I think the line is whether Florida's law is consistent with a type of law that the founders would have understood to, that our tradition would have been understood to permit. And I don't think there's any question that the founders would have understood Florida's to be permitted to be restricting those under 21, because for them, that was the line. And that was the line throughout Reconstruction as well. Justice Barrett's concurrence in Rahimi has received quite a bit of attention from some of our sister circuits that are considering these Second Amendment challenges. And she seems to clarify that when we look at these historical analogs, we should look at them with a, she says, with a wider lens. Historical regulations reveal the principle, not a mold. What do you think she means about that? And how do we, in this appeal, consider historical regulations with parallel principles? What do you think she means by that when she makes reference to a more generalized approach to historical analogs? Sure. Well, I think after Bruin, courts had been viewing restrictions with an overly narrow lens, and they were matching up and saying, you know, well, this law has one minor distinction from a law at the founding. This law has another minor distinction. And in Rahimi, the court stepped back from that narrow lens and said, you have to broaden it. You have to look at the principles underlying the historical tradition. So you have to look at the principles. Why are those under 21 at the founding restricted? Because of their reason, their decision making, their capacity. And so that's the same principle animating Florida's law today. And if you also match up the how, the how is the same, because you step back. And instead of looking at, well, is this precisely the same method of restricting firearm purchase by making, for example, contracts voidable? No. You have to step back and say, well, does it affect the same class of people, those under 21? Is it the same type of— The counsel going to the how, it does seem that in Rahimi, the majority, at least, focused on the criminality part. In other words, part of the how analysis was that the surety laws and the surety laws in violation of them had a criminal sanction attached to them. And while the criminal sanction was not identical, there was criminal sanction to it. Here we have, even taking as an analogy the voidable laws that you're talking about, there isn't, that I can tell, and correct me if I'm wrong, any criminal sanction at all attached to it. And yet here, there is a, I think it's a first-degree felony if a minor purchases a firearm. A third-degree felony. Third-degree felony, which is up to five years in state prison, as I recall. So that's pretty significant. So the penalty issue in Rahimi, the court was talking about the penalty for being a member of the class of people subject to restraining orders, and the penalty was disarming them for a temporary period. It was not talking about the criminal sanction associated with violating that law. And here, you're talking about the same thing. The penalty is essentially being in the class of persons under 21, and the disarmament until you're 21 is the, quote, penalty under Rahimi. I think that that's the appropriate method of analysis when you're talking about that. But also under Rahimi, the court — Why bother looking at the sanction? In other words, if the surety law has prohibited those who are dangerous from having firearms, why bother looking at the punishment? Yet Rahimi made a point specifically in the Howe comparison to compare the punishments. It's hard to make a one-to-one comparison in this context because minors were not — You can make a one-to-one. It's losing for you. That's the problem, right? Because minors could not be — were not subject to the same type of criminal restrictions. So that's why the parents were the ones regulated by the militia. Right, but you can't regulate — in the state of Florida, you can't regulate a parent, and a parent cannot be held criminally liable or civilly liable for the actions of an 18-year-old who is an adult, correct? Yes, Your Honor. And that's why you have — you see a little bit of a shift. You see at the founding and during the Reconstruction era, the parents and the sellers of firearms were those that were regulated because the minors could not be subject to criminal penalties for that conduct. But now, of course, they can. And so we think that the penalty is — They can because they're adults, right? I mean, isn't — I mean, I guess — so Judge Wilson asked you the question. He pointed to Justice Barrett's concurrence about principle. And I think you made the right response, which is the point here is we're not looking for an identical law. But on the flip side, the fact that you have 21, sort of that age limit in history, aren't we supposed to look at the principle? And isn't the principle through history that adults can purchase firearms and that minors, legal minors, can't? I hate to sound like a broken record, but I think that the age majority has varied for different activities throughout history. So a 1970s legislative decision saying you're an adult for this purpose — Well, I mean, let me ask you this. In Florida, are the parents — are parents responsible for anything that a 19-year-old does? I wouldn't want to make a sweeping characterization, but I don't think so. OK. Yeah. So, I mean, like, if a 19-year-old is caught on the side of the street, just walking along the side of the street, do the police, like, take that 19-year-old and return him to his parents? No, Your Honor. Can you do a curfew law for 19-year-olds only and say the parents have to be responsible to make sure that they're home by midnight? I don't believe so, Your Honor. No. So then what is the justification, I guess — and maybe your argument is you don't have to have one — but what is the justification for saying, well, for a 21-year-old, you have to — for a 20-and-a-half-year-old, you have to ask your parents to buy you a firearm, but you don't have to ask them to rent an apartment for you. You don't have to ask them to give you money. You, in fact — they owe you no obligations to provide you any food, shelter, clothing, anything. But if you want a firearm, you have to ask your parents. The justification is the historical justification. That's the way it was at the founding. That's the way it was throughout Reconstruction. So can you get rid of the right to vote? No, Your Honor. That's constitutionally enshrined. To answer Judge Brasher's question, could the answer be that the Florida legislature has relied upon data which suggests that people under the age of 21 who purchase firearms are more dangerous to their fellow Floridians than those who are over the age of 21? That's how we argued it before the panel, Your Honor, but I think that that's the type of means-end balancing that is no longer conducted after Brewer's regime. Well, it would — might it, though, be consistent with the historical tradition that the age of 21 is the point at which we can assume that the individual has reached the age of reason and that making that distinction between majority and minor status is supported, even though we're going to be more generous about some other things? Yes, Your Honor. If Florida wanted, could it not return the age of majority to everything but voting to 21? It could do that, couldn't it, legislatively? I think that's right, Your Honor, and that's why — I guess the idea of our colleagues is if Florida wants to be more generous, starting in the 1970s, about a variety of activities for what has, for the vast majority of American history, been considered minor status, that it somehow disables the state's same ability to restrict minors from purchasing firearms. I think that's exactly right, Your Honor, and I think that that goes to why — that goes to the why being consistent with the why at the founding. So if in 1969, Florida could have done this, but in the 1970s, I guess they couldn't. I think that's right, Your Honor, and so the — In 1968, wasn't there a federal law enacted that prohibited possession of, or sale of firearms to under-21s of certain types of firearms? Certain types, yes. Yeah. And so my question is similar, I think, to the Chief's in that even though, given Bruin, there is no opportunity, it appears, for the state to present its interests either as compelling or even under some rational basis, is that analysis completely lost when it comes to the step two prong under the Bruin test? I'm not sure that it's completely lost, but I think that Chief Judge Pryor has identified a way which you could fit it in, and that, I think, is in the why of the restriction. So it's the why similar to that at the founding, and that's the lack of reason, decision-making, and capacity that the founders viewed those under 21 as having. And I think that that's consistent with Florida's law today. And so in Rahimi, even though the court focused on the fact that he was a felon, or in this criminal proceeding, it seems that the analysis was also focused on a propensity to engage in more violence with the possession of a firearm, as Judge Wilson just noted, the data showing that certain age groups have a propensity to engage in certain behavior that can undermine the overall goal, which is public safety. I think that's right, Your Honor. I would just hesitate to push the analysis too far back into the means and type of analysis pre-Bruin and pre-Rahimi. We're supposed to be looking at historical restrictions, but I have a question anyways, which is a little bit of a tangent from that. Were there any laws at the time of the founding or at the time of the ratification of the 14th Amendment that gave minors the right to purchase firearms? No, Your Honor. Of course, this historical era, the founding, and even largely the Reconstruction era, we're talking about a very different legal regime, are we not? I mean, the most law was the common law. That's right, Your Honor, and that's why Bruin said the common law is part of that historical tradition that you look to. Right. Back to Judge Luck's question about whether or not this behavior was criminalized back at the founding, and we're looking through the lens of Rahimi, we need to find a historical analog. Florida's law here criminalizes this behavior, but back in the founding, there were no restrictions on minors' ability, direct restrictions on minors' ability to purchase firearms. There may have been impairment of a shopkeeper's willingness to extend credit, but weren't all the founding era laws ensuring young adult access to firearms, notwithstanding any limited powers that they may have had as legal minors? Their parents could give them guns if they were going to serve in the militia. They had to come with a gun, whether their parents provided it or they had it. They could purchase through cash. They could purchase through barter. If they had a willing shopkeeper, they could purchase on credit. I think, I guess my question goes back to Judge Luck. You're not telling us anything at the founding that this was criminalized behavior. No, and it wasn't criminalized for a reason. Well, actually, a couple of reasons. One is that all of the states recognized that minors were effectively restricted from purchasing, which is why some exempted minors from bringing them all together, or from purchasing them all together. Many charged parents with the duty to acquire the firearm for militia service, and most made the parents liable for a minor to muster without a firearm. Lord of Luck, can a parent give a minor a firearm? Yes, Your Honor. Just like the founding. Let me ask, can I follow up on that? I'm actually confused about that, because you've got straw purchaser laws and things like that. If a 22-year-old goes into a gun store with a 19-year-old and says, I'm going to buy this gun for this 19-year-old here, can he do that? There may be some issues surrounding straw purchase. Right, so I'm actually not, that's the thing, I'm actually not sure about that. I think under Florida law, if someone goes and buys a gun to give it to a 20-year-old who couldn't buy the gun him or herself, that seems like that violates Florida law too. Yes, there is certainly clarity that a parent or someone over the age of 21 may gift or loan a firearm to an individual under 21. There's no restriction on possession. Does it matter at all that the regulation amounts to a temporary ban rather than a permanent ban? All you have to do is wait until you're 21 and then you can buy a gun. Sure, as opposed to the congruence with the how. It's the same as at the founding. It's 21, it's temporary, and it's only based on purchase. If there are no further questions. I don't hear any, Mr. Powell. Thank you very much. Thank you. We respectfully request that the Court affirm. Okay, Mr. Sweeney, you've saved five minutes. Thank you, Your Honor. Mr. Sweeney, can you answer my question of whether or not the state's interest in passing this law, even under this construction of Bruin as it's presented and interpreted, is completely lost in this current analysis? I don't know that it's lost. Bruin requires the Court to examine the relative justification behind laws, and I certainly think that gives the state plenty of room to put before the Court the reasons behind the law. So I do not believe that it is lost in this analysis, Your Honor, and I think your point is well taken. It's clear from this discussion that the founding era was a different time from ours, and while they didn't trust minors with credit, they certainly trusted them with  But didn't they trust them with firearms under the supervision of their parents and under the supervision of militia commanders and under the supervision of military commanders? I mean, there is certainly historical evidence that shows that that was a concern of our founding generation, that individuals who were under the age of 21 would always be subject to the supervision of somebody else when they were in the military or the militia or even with their parents with firearms. Well, I don't think we have any record evidence one way or the other of that, Your Honor. What we do know— But we do have, again, we're not limited to the record when we are assessing historical sources if, in fact, the history shows that. What we do know is that I know, Your Honor, in the panel considerations and the state in their briefing of this case over the last six years would have brought before this court any other restrictions on firearm possession, use, carrying, acquisition that exist at the time of the founding, and there are none. Can I ask you this, though? You began your presentation by saying, we know the founding was a different time. The founders didn't trust miners with respect to credit, but we know that they trusted miners with respect to firearms. But this is a challenge to a statute about purchase, right? So maybe it's only incidentally about firearms. It's really about purchase. Perhaps, but I think the controlling difference is that the common law avoidability of contracts for miners, as well as the state statutes from the reconstruction area that the state wants to point to, target miners, not under 21. They target miners. There is no fundamental right that does not apply below the age of 21, and at least since the 26th Amendment changed the voting age from 21 to 18, and all states have caught up with that, and miners are under 18, not under 21 today. But miners, if you're bringing up that point, miners were not given the right to vote those 18 to 21 until the 1960s. And as a matter of fact, the Supreme Court struck down part of a federal law where Congress tried to give 18-year-olds the right to vote in state elections and local elections. They upheld it as to federal elections, but not statewide. So I understand the rights are different, and I understand that we're supposed to be looking at restrictions on the Second Amendment right to keep and bear arms. But if you're bringing up the point about fundamental rights and the line being 18 or 21, it wasn't until the 1960s that any state, I think Georgia might have been the first, gave miners the right to vote. How does that play into your historical analysis? Well, I don't think you could take it away. So I don't think the Constitutional Amendment, and I don't think there's any other fundamental right. What do you mean you couldn't take it away? I don't understand. What do you mean you couldn't take, the right to vote is a right granted by the legislature, at least it was until the 26th Amendment. What do you mean it couldn't be taken away? If state law didn't grant it, you didn't have it. Yeah. It's called a franchise for a reason. Yeah, you couldn't walk in as a 17-year-old and decide, I want to cast a vote if state law set the age at 18, 19, 20, or 21, and it wasn't until the 26th Amendment. In a state election, that's true, Your Honor, as opposed to a federal election. I agree with that. Right, so what does that do with your historical argument about fundamental rights and the line being 18? That is a core fundamental right in a democracy. Which the Constitution cedes to the states to determine. Okay. The distinction between that and the Second Amendment, respectfully, Your Honor. Okay. The Supreme Court, I think, has made it pretty clear that one way or another, marriage is a fundamental right. I understand that the age of marriage in Mississippi is 21. Do you think that's unconstitutional? I would think, in light of recent decisions from the Supreme Court, that certainly could be challenged, but I certainly haven't looked at it. Okay. Mr. Sweeney, I think we have your case. We will be adjourned.